IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

M.S.

     **Plaintiff,**

v.                          **No. 15-cv-912-MCA-SCY**

**BELEN CONSOLIDATED SCHOOL
DISTRICT, CITY OF BELEN, and
ESTATE OF MICHAEL ESQUIBEL,
in his personal capacity acting under color of law,**

     **Defendants.**


## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on *City of Belen's Amended Motion for Summary Judgment as to Counts III, IV, V, and VII on Qualified Immunity and Other Grounds*, filed September 22, 2016.  [Doc. 87] The Court has considered the parties' submissions, the relevant law, and the record and is otherwise fully advised.  The *Motion* shall be denied in part, and granted in part.

## BACKGROUND

This lawsuit arises out of allegations that Michael Esquibel (now deceased), an officer of the Belen Police Department who worked as a school resource officer (SRO), sexually abused M.S., a minor student who attended Belen Middle School and Belen High School.  [Doc. 14 ¶¶ 23-34]  Having provided an overview of the undisputed material facts in its *Memorandum Opinion and Order* pertaining to *Defendant City of Belen's Motion for Partial Summary Judgment That the Torts Alleged by Plaintiff Do Not*

*Fall within the Scope of Officer Esquibel's Duties* (Doc. 83), the Court provides

additional facts only to the extent that that they are required to provide context for its

analysis of the present *Motion*.

## Standard for Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure allows summary judgment when the

evidence submitted by the parties establishes that no genuine issue of material fact exists

and the moving party is entitled to judgment as a matter of law.  "[A] party seeking

summary judgment always bears the initial responsibility of informing the district court

of the basis for its motion, and identifying those portions of [the record] . . . which it

believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v.

Catrett*, 477 U.S. 317, 323 (1986).  Once the movant meets this burden, the nonmovant is

required to put in the record facts showing that there is a genuine issue for trial.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); Fed. R. Civ. P. 56(c).  An

issue is "genuine" when the evidence before the Court is such that a reasonable jury

could return a verdict in favor of the nonmovant as to that issue.  *Anderson v. Liberty

Lobby Inc.*, 477 U.S. 242, 248-52 (1986).  A fact is "material" if under the substantive

law it is essential to the proper disposition of the claim.  *Id.* at 248.

It is not the Court's role to weigh the evidence, assess the credibility of witnesses, or

make factual findings in ruling on a motion for summary judgment.  *Daniels v. United

Parcel Serv., Inc.*, 701 F.3d 620, 627 (10th Cir. 2012).  Rather, the Court assumes the

admissible evidence of the nonmovant to be true, resolves all doubts against the movant,

construes all admissible evidence in the light most favorable to the nonmovant, and draws

2

all reasonable inferences in favor of the nonmovant.  *Hunt v. Cromartie*, 526 U.S. 541, 551-52 (1999).

**The City's Motion for Summary Judgment as to Counts III and IV**

In Count III, Plaintiff claims, pursuant to 42 U.S.C. Section 1983, that Esquibel violated her Fourteenth Amendment substantive due process rights by perpetrating sexual abuse against her from the time that she was a middle school student through her senior year in high school.  [Doc. 14 ¶¶ 92-98]  In Count IV, Plaintiff claims, pursuant to 42 U.S.C. Section 1983, that Esquibel's conduct constituted a violation of her Fourteenth Amendment right to equal protection.  [Doc. 14 ¶¶ 99-105]  As grounds for seeking summary judgment as to Counts III and IV, the City contends that Officer Esquibel is entitled to qualified immunity.  [Doc. 87 p. 6]

"The defense of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *A.M. v. Holmes*, 830 F.3d 1123, 1134 (10th Cir. 2016).  The City does not challenge the notion that Esquibel's sexual abuse of M.S. (the occurrence of which it does not concede, but it assumes for the sake of argument), constituted a violation of clearly established constitutional rights.  Nor, in light of precedent, could the City reasonably support such a challenge.  *See*, *e.g. Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013) (recognizing that a woman's "right to bodily integrity, which is a substantive due process" right, was violated when she was sexually assaulted by a police officer); *Abeyta ex rel. Martinez v. Chama Valley Indep. Sch. Dist. No. 19*, 77 F.3d 1253,

3

1255 (10th Cir. 1996) ("Sexual assault or molestation by a school teacher violates a student's substantive due process rights); *Maldonado v. Josey*, 975 F.2d 727, 730-31 (10th Cir. 1992) ("In the . . . sexual abuse context[] a state actor directly inflicts the harm on the student and thereby implicates the Due Process Clause which . . . imposes limitations on state conduct."); *see also Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 451-52 (5th Cir. 1994) ("It is incontrovertible that bodily integrity is necessarily violated when a state actor sexually abuses a schoolchild and that such misconduct deprives the child of rights vouchsafed by the Fourteenth Amendment.").  Instead, the City focuses on the issue whether Esquibel was a "state actor" or acting "under color of law" such that Plaintiff's Section 1983 claims are viable.  [Doc. 87 p. 8-15]

42 U.S.C. Section 1983 provides a civil action for the deprivation of rights.  In relevant part, it provides that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law[.]

42 U.S.C. § 1983.  "The purpose of [Section] 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Jojola v. Chavez*, 55 F.3d 488, 492 (10th Cir. 1995) (alterations & citation omitted). "Therefore, the only proper defendants in a Section 1983 claim are those who represent the state in some capacity, whether they act in accordance with their authority or misuse it." *Id.* (alterations omitted).

"The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *West v. Atkins*, 487 U.S. 42, 49 (1988). "It is firmly established that a defendant in a [Section] 1983 suit acts under color of state law when he abuses the position given to him by the State." *Id.* at 49-50. Thus, usually, "a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law." *Id.* at 50.

While "state employment is generally sufficient to render the defendant a state actor[,] . . . . an otherwise private tort is not committed under color of law simply because the tortfeasor is an employee of the state." *Jojola*, 55 F.3d at 493. This proposition reflects the fact that, "in most cases" an individual employed by the state who violates another individual's federal rights does "so by virtue of the authority vested in [him] under state law" "regardless of whether the employee hews to the line of [his] authority or oversteps it." *Id.* (alterations omitted). But in some circumstances, "a tort by a state employee simply may not have been committed on account of the authority vested in the employee by the state." *Id.* And in those circumstances, an "otherwise private tort cannot automatically amount to action 'under color of state law' so as to support a Section 1983 claim." *Jojola*, 55 F.3d at 493.

The City takes the position that Esquibel was not acting "under color of state law" when he abused M.S. because the abuse was an exclusively "personal pursuit," undertaken outside of the performance of any duty imposed upon him by the state. [Doc.

87 p. 9-10]  To the same end, but stated differently, the City argues that the abuse

constituted a private tort, committed in Esquibel's private capacity, which could have

been accomplished by "anyone."  [Doc. 87 p. 10-15]

The City supports its position by citing a number of cases in which the

perpetrators of sexual misconduct have been held not to be acting under color of state

law.  For example, in *Wentz v. Park County School District  No. 16*, 968 F.2d 22, *2

(10th Cir. 1992) (unpublished table decision), and in *D.T. by M.T. v. Independent School*

*District No. 16 of Pawnee County, Oklahoma*, 894 F.2d 1176, 1188 (10th Cir. 1990),

school teachers who perpetrated sexual abuse against students during summer vacation

were held to not be state actors.  In so holding, the respective courts focused on the fact

that during the summer months, the teachers were not under a contract with the school,

and, as the *D.T.* court reasoned, the teacher in that case "had no duties or obligations to

perform on behalf" of the school during the summer months, nor did the school sponsor

or approve of the activities which ultimately led to the teacher's access to, and abuse of,

the students.  *D.T.*, 894 F.2d at 1182-83, 1186-87 (stating that the abuse occurred during

an out-of-town trip related to a private basketball camp); *Wentz*, 968 F.2d at *1 (stating

that at the request of the student's mother, the teacher had developed a "friendship"

wherein the teacher "acted as a father figure" toward the student, and the abuse occurred

during an overnight visit during summer vacation).

The City also relies on *Jojola*, in which a school custodian forcibly molested a

high school student after intercepting her on her way to the bathroom and leading her into

a dark classroom.  55 F.3d at 490.  In upholding the dismissal of the plaintiff's Section

1983 claim against the custodian, the *Jojola* court observed that the complaint was "devoid of any allegation that [the custodian] enticed [the student] into the classroom through the use or misuse of any state authority he may have possessed." *Id.* at 494. This pleading deficit was brought into further relief when, at a hearing on the motion to dismiss, the plaintiff's counsel was asked by the judge, "In this intentional sexual act that [the custodian] is accused of, how is that under color of law." and counsel responded, "Your Honor, I can't answer you." *Id.*

Further, in support of its theory that "anyone" could have sexually abused M.S. as a basis for concluding that Esquibel's actions were not undertaken under color of state law, the City cites *Beedle v. Wilson*, 422 F.3d 1059 (10th Cir. 2005). In *Beedle*, a nurse's aide sexually assaulted a heavily sedated hospital patient. *Id.* at 1074. In holding that the aide had not accomplished the assault by the exercise of "state-derived authority" over the patient, the court reasoned that the aide "engaged in conduct wholly unrelated to her duties and authority as a nurse's aide, conduct that could have been done by anyone who wandered into [the patient's] room." *Id.* at 1074-75. In support of this reasoning, the court noted that "[t]here was no allegation, for example, that [the aide] was the one who heavily sedated [the patient] to enable her to carry out the alleged assault." *Id.* at 1075. The mere occurrence of the assault, "while abhorrent," was not sufficient to satisfy the "under color of state law" pleading requirement of a Section 1983 claim. *Id.*

As a final example, the City relies upon *Roe v. Humke*, 128 F.3d 1213, 1214 (8th Cir. 1997), a case involving a police officer's sexual abuse of an eleven-year-old school student. The defendant, Humke, was a police officer whose duties included "work[ing]

with the local school, providing security and conducting other programs." *Id.* at 1214.

Humke was a "goodwill ambassador for the [police] department" which, he explained,

involved "trying to get [children] to trust him" because "it is important for children to

learn to trust the police." *Id.* at 1215. Humke met the eleven-year-old student when he

was sitting outside the school in his patrol car and in uniform, and thereafter, he would

see and talk to the student three or four times per week, occasionally give her rides home,

and buy her small gifts. *Id.* at 1214. He would also drive to the student's house in his

patrol car and talk to her from his car. *Id.* at 1214. On several occasions, while he was at

the school, Humke suggested to the student and her school friends that they should go to

his farm to ride all-terrain vehicles. *Id.* When the student agreed, Humke picked her up

at her house on a Saturday and met with the student's parents, whom he had met before

and who approved of Humke's plan to take the student to his farm. *Id.* On the Saturday

that he took the student to the farm, Humke was off duty, driving his personal vehicle,

and not wearing his police uniform or carrying a gun. *Id.* at 1214-15. While they were

at the farm, Humke sexually abused the student. *Id.* at 1215. In considering whether

Humke was "acting under color of state law[,]" the Eighth Circuit viewed the Saturday

events "solely in isolation." *Id.* at 1216. The court concluded that because "there was no

nexus between his position as a police officer and his abuse of [the student] *on the day in*

*question*" Humke was not acting under color of state law when he abused the student. *Id.*

at 1218 (emphasis added).

      With the exception of *Humke*, which the Court addresses later, the foregoing cases

are not helpful in the context of this case. Plaintiff has presented a volume of undisputed

material facts and legal analysis on the issue of whether Esquibel was acting under color of state law. In that regard, her proffer surpassed the plaintiffs in *Jojola* and *Beedle* who appear to have relied on little more than the mere fact of the occurrence of sexual abuse to support their § 1983 claims. Further, the defendants in *Wentz* and *D.T.* abused their victims when they were not under a contract with their respective schools, and were alone with their victims during the summertime to engage in activities unrelated to the school. Here, however, it is undisputed that Esquibel sexually abused M.S. during the school year, while he was employed as the SRO. In light of the more comparable authorities discussed in the paragraphs that follow, these facts alone render *Wentz* and *D.T.* not useful to the Court's analysis.

In *Doe*, a high school student was seduced and then repeatedly sexually abused (both on and off campus) by her teacher (Stroud), who also served as her basketball coach. 15 F.3d at 447-449. In rejecting the argument that the teacher's actions were not taken under color of state law, a proposition for which the defendants cited *D.T.*, the Fifth Circuit reasoned as follows:

> In this case, [unlike the teacher in *D.T.*], Stroud took full advantage of his position as Doe's teacher and coach to seduce her. He required Doe to do little or no work in the classroom and still gave her A's. He also spoke to one of Doe's other teachers about raising her grade in that class. Stroud was also Doe's basketball coach and he exploited that position as well. The first physical contact Stroud had with Doe was after a basketball game in November 1986 when he grabbed her and kissed her. Stroud's physical contact with Doe escalated thereafter. During the next several months Stroud took Doe from his classroom to an adjoining lab room where he kissed and petted her. During that same period of time Stroud also met Doe in the school's fieldhouse where similar activity took place.

As the court in *D.T.* recognized, if a "real nexus" exists between the activity out of which the violation occurs and the teacher's duties and obligations as a teacher, then the teacher's conduct is taken under color of state law. As demonstrated by the above facts, the nexus that was missing in *D.T.* was clearly present in this case.

*Doe*, 15 F.3d at 452 n.4 (citation omitted).

In *United States v. Giordano*, 442 F.3d 30, 33, 47 (2nd Cir. 2006), a city mayor acted "under color of state law" when he sexually abused two children who were made available to him via a prostitute in his acquaintance. The mayor argued that "he cannot have acted under color of law because his actions, although they took place during his mayoralty, were clearly a part of and derived from a personal relationship he had with [the prostitute] that was unrelated to and predated his mayoralty." *Id.* at 43 (alterations omitted). In rejecting this argument, the Second Circuit recognized that "gain[ing] access to the victim in the course of official duty" is but one way to act under "color of law"; an official may act under color of law "even when he . . . encounters the victim outside the conduct of official business and acts for reasons unconnected to his or her office, so long as he . . . employs the authority of the state in the commission of the crime." *Id.* The court concluded that the mayor took the latter approach, "invok[ing] the real or apparent power of his office to make the continuing sexual abuse possible" by telling his victims that "[t]hey will get in trouble"—a warning to which the child victims ascribed meaning based on their subjective understanding of the mayor's authority. *Id.* at 45-46. One victim testified that she did not disclose the abuse because she "thought the [m]ayor could rule people, like

be their boss[,]" that the mayor "could have someone hurt my family," and "I was afraid he own[ed] everybody." *Id.* at 36. The other victim testified that "she understood that the mayor's role was to 'protect the city' and 'watch over us, like God'" and she did not disclose the abuse because she believed that "she would get put in jail" because the mayor "had power." *Id.* Thus, the mayor "threatened his victims by invoking 'a special authority' to undertake retaliatory action, and . . . used his authority to cause the victims to submit to repeated abuse . . . by causing [them] to fear that he would use his power to harm them if they reported the abuse." *Id.* at 45.

In *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1298-1300, 1305 (11th Cir. 2001), a city manager was held to have acted under color of state law when he raped a subordinate employee in her home, after work hours. The city manager began sexually harassing the employee almost immediately after he became her boss, with the harassment occurring in the office during the work day, and after hours when the city manager would call the employee at home. *Id.* at 1299-1300. On the night of the rape, the employee (who had previously pursued a music career) sang at a rotary club function that was attended by the city manager, the mayor, and other city officials. *Id.* at 1298, 1300. Although the employee had arranged for the police chief to give her a ride home from the rotary club, the city manager intervened and announced that he would take her home instead. *Id.* at 1300. When he dropped her off at home, the city manager followed the employee inside and forcibly raped her. *Id.* at 1300. The harassment continued the next day

at the office.  *Id.* at 1304.  In upholding a jury verdict that the city manager had raped the employee "under color of law," the court reasoned that the city manager's "abuse of his authority began on the first day of his employment with the [c]ity and did not end until after he sexually assaulted [the employee] and she left her job at the [c]ity for good," and that in the "context of [the city manager's] continual exploitation and leverage of his authority over [the employee] . . . we find a sufficient nexus between his duties and obligations as [c]ity [m]anager and . . . the abuse of that authority to facilitate his harassment and ultimate sexual assault" of the employee.  *Id.* at 1300, 1305.

In *Whitney v. State of New Mexico*, 113 F.3d 1170, 1174 (10th Cir. 1997), our Tenth Circuit reversed the district court's dismissal of the plaintiff's Section 1983 claim against a state employee who possessed authority to grant or deny the plaintiff's application for a daycare license.  The plaintiff alleged that the state employee sexually harassed her while he was deciding whether to issue the license, denied her application because she is female, then, when she went to work for a daycare facility because she could not open her own facility, he harassed the plaintiff by suggesting to her new boss that they were intimately involved.  *Id.* at 1172.  The court reasoned that the plaintiff's allegations demonstrated that the state employee "had some state-derived authority over [the plaintiff's] ability to" obtain the license, and that he "could not have harassed [the plaintiff] absent his authority as an agent for the [s]tate."  *Id.* at 1174-75.  As such, the plaintiff's allegations adequately demonstrated that the state employee "in some way exercised state authority over her."  *Id.* at 1175 (alterations and citation omitted).

12

Viewing the undisputed facts of this case in the light most favorable to M.S., a jury could reasonably find that Esquibel was acting under color of state law when he sexually abused M.S.  Like the teacher in *Doe* who took advantage of his position as a teacher and coach to seduce and sexually abuse a student, Esquibel took advantage of his position as SRO and his affiliation with the Belen Police Department softball team to sexually abuse M.S.  Upon meeting M.S. at her middle school, Esquibel gave M.S. his personal cell phone number and asked that she let him know when she had been picked up from school.  [Doc. 96 ¶ I]  Thereafter, he engaged her in text message conversations during and after the school day.  [Doc. 96 ¶ I; Doc. 96-6 ¶ 3, p. 3-8]  Esquibel furthered a personal relationship with M.S. by regularly playing softball with her on campus during the lunch period, and by keeping her softball glove and other equipment in the trunk of his police car.  [Doc.96 ¶ K; Doc. 96-6 ¶¶5-6]  Esquibel also exhibited favoritism toward M.S., using his authority as the SRO to remove M.S. from detention so that she could attend a special school event called "tropical day[,]" bringing her candy and pizza during the school day, and making hot chocolate for her in his security office.  [Doc. 97 ¶ 8; Doc. 96 ¶ K; Doc. 96-7 p. 23-24]  Under the guise of lending her some equipment so that she could practice playing softball and join the Belen Police Department softball team, Esquibel lured M.S. to his apartment where he sexually abused her for the first time. [Doc. 96 ¶¶ N, P; Doc. 96-7 p. 6-8, 16]

A jury could also reasonably conclude that, like the mayor in *Giordano*, Esquibel took advantage of his apparent authority (and M.S.'s understanding of that authority) as a police officer and SRO to lure M.S. to his apartment for a second time, and to ensure that

M.S. did not disclose the abuse to anyone.  M.S. understood that as the SRO, Esquibel

had "authority over everybody" and she had seen him arrest kids at the school.  [Doc. 96-

7 p. 22]  While wearing his police uniform, including his police utility belt, Esquibel

perpetrated the sexual abuse, and admonished M.S. not to tell anyone about it.   [Doc. 96

¶¶ P, Q; Doc. 96-7 p. 9, 11]  When, by virtue of his position as SRO, Esquibel retrieved

M.S.'s confiscated cell phone and reviewed her text messages from which he obviously

inferred that she planned to tell her friend about the sexual abuse, he used his actual and

apparent authority as SRO to remove M.S. from class, keep her with him for the rest of

the school day, and vehemently warn her to not disclose the abuse to anyone.  [Doc. 96

¶¶ U-V; Doc. 96-7 p. 5, 21]

Finally, as our Tenth Circuit stated in regard to the perpetrator of sexual

harassment in *Whitney*, and as was implied if not held in *Giordano*, *Griffin*, and *Doe*, it is

reasonable to infer that Esquibel could not have perpetrated the sexual abuse absent his

position and authority as SRO.

*Humke* is an outlier to the extent that the court viewed the circumstances of the

sexual abuse in isolation from the process that led to it.  However, even were the Court to

follow the *Humke* court's approach, the outcome would not be favorable to the City.

Viewing the acts of sexual abuse in isolation, Esquibel perpetrated the sexual abuse on

two school days, directing M.S. to go to his apartment before she attended band practice.

Esquibel wore his uniform, including his utility belt, during the incidents.  Thus, the facts

that informed the *Humke* court's conclusion that the officer was not acting under color of

state law—*i.e.*, that the sex abuse occurred on a Saturday, when Humke was not in uniform, and when he was driving a personal vehicle, are not present here.

In sum, viewing the actions taken by Esquibel that lay the groundwork for the acts of sexual abuse, and the actions taken by Esquibel to hide the abuse, as a continuing course of conduct as did the Courts in *Griffin*, *Doe*, and *Giordano*, a jury could reasonably conclude that Esquibel used his position as the SRO to befriend M.S., to sexually abuse her, and to prevent her from disclosing the abuse.  For all of the foregoing reasons, a jury could reasonably conclude that Esquibel's actions were taken under color of state law.  The City's *Motion for Summary Judgment* as to Counts III and IV shall be denied.

**The City's Motion for Summary Judgment as to Count V**

In Count V, Plaintiff claims, pursuant to 42 U.S.C. Section 1983, that the City violated her Fourteenth Amendment right to substantive due process by failing to adequately train and supervise Esquibel.  [Doc. 14 ¶¶ 106-118]  The City seeks summary judgment on the ground that it neither "authorized" nor "approved" Esquibel's alleged sexual abuse of M.S.  [Doc. 87 p. 16]

It is well settled that a municipality may not be held liable for the acts of its employees under a theory of *respondeat superior.  Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978).  "Rather, to establish municipal liability, a plaintiff must show 1) the existence of a municipal policy or custom, and 2) that there is a direct causal link between the policy or custom and the injury alleged."  *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010). "A municipal policy or custom may take the form of . . .

the failure to adequately train or supervise employees, so long as that failure results from
'deliberate indifference' to the injuries that may be caused." *Id.* at 788. In turn, "[t]he
deliberate indifference standard may be satisfied when the municipality has actual or
constructive notice that its action or failure to act is substantially certain to result in a
constitutional violation, and it consciously or deliberately chooses to disregard the risk of
harm." *Id.* at 789. The notice requirement is usually established by proving the existence
of a pattern of tortious conduct." *Id.* However,

> deliberate indifference may be found absent a pattern of unconstitutional
> behavior if a violation of federal rights is a highly predictable or plainly
> obvious consequence of a municipality's action or inaction, such as when a
> municipality fails to train an employee in specific skills needed to handle
> recurring situations, thus presenting an obvious potential for constitutional
> violations.

*Id.*

Plaintiff's claim rests on a theory that the City's failure to adequately train and
supervise Esquibel with respect to his daily interactions with students presented the
obvious potential for, and was a causally linked to, Esquibel's sexual abuse of M.S.
[Doc. 97 p. 22-23] While the City's *Motion for Summary Judgment* as to this claim rests
solely on the fact that once it learned of M.S.'s allegation, it began an internal affairs
investigation, several undisputed material facts pointed out by Plaintiff demonstrate that
summary judgment is not appropriate as to this claim. [Doc. 87 p. 16; Doc. 87-8 p. 7-8;
Doc. 87-9]

Plaintiff's undisputed material facts include the following. A "Memorandum of
Understanding" between the City and the Board of Education reflects a mutual agreement

to have a SRO for the purpose, among others, of "improv[ing] relationships between law enforcement officers and today's youth" with the SRO to "conduct his. . . law enforcement activities pursuant to all of the Belen Police Department[']s operating guides, policies, and operation directives[.]" [Doc. 96-1 p. 1-2; Doc. 96 ¶ A; Doc. 97 p. 23]  In turn, the Belen Police Department's operating guide and policy for the SRO provides, among other things, that the SRO was "primarily responsible for working within the school system to build positive relationships between students . . . and the police while enforcing the laws promoting a safe . . . environment." [Doc. 96 ¶¶ D-E; Doc. 96-2 p. 1; Doc. 97 p. 23]  There was an "emphasis" on working with students and the SRO was "required to perform the functions of law enforcement officer, educator and counselor while becoming an integral member of the school community."  [Id.]  An example of the SRO's duties and responsibilities was to "[f]oster, develop, and maintain open lines of communication between students, faculty, and police officers[,]"  and to "[d]evelop positive relationships between" those three factions.  [Id.]

From the fact that Esquibel was given good marks on his performance evaluations, a jury could reasonably infer that, insofar as the Belen Police Department was concerned, Esquibel's actions (playing ball alone with M.S., bringing her to an off-campus park to play ball with him, his supervisor, and other uniformed police officers, and other of his interactions with students) were viewed as a part of Esquibel's satisfactory if not exemplary job performance.  [Doc.  96 ¶¶ M, H, II, JJ; MM; Doc. 96-5; Doc. 96-1; Doc. 97 p. 23] Further, from the fact that Esquibel received a good performance evaluation notwithstanding "several" complaints stemming from the "tactics" that he used on middle

school kids, and despite his supervisor having never met with school district officials or students to inform his impression of Esquibel's performance, a jury could reasonably infer an absence of adequate supervision. [Doc. 96 ¶ HH, JJ, NN; Doc. 96-4; Doc. 96-5; Doc. 97 p. 23]

Finally, it is well established that a municipality cannot be held liable where an otherwise adequately trained and supervised officer makes a "mistake." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 391 (1989). However, "it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id.* at 390. Plaintiff has provided evidence from which a jury could reasonably infer that this case is demonstrative of the latter proposition. [Doc. 96 ¶ QQ; Doc. 96-15; Doc. 97 p. 23] Sergeant Dwight L. Moore, an officer with the Houston Independent School District Police Department with twenty years of experience, stated in an affidavit that "[s]chool district policing is one of the most challenging aspects of law enforcement and has unique qualities and characteristics that must be understood and valued by a police department engaging in the placement of SRO's in schools." [Doc. 96-15 ¶ 6] Among other things, Sergeant Moore opined that, although Esquibel received "appropriate initial training," the challenges faced by SRO's requires on-going follow up training, which Esquibel did not receive. [Doc. 96-15 ¶¶ 12-13] This is important because

> [t]raining of SRO's [sic] must be ongoing as the officer is balancing a duty
> to be engaged with youth in a school setting, but must always maintain
> clear boundaries and professionalism. Consistent training and reinforcing
> the principles of an SRO enables re-visiting the challenges of the job under
> the direction of a more experienced officer. . . . [W]ithout follow-up and
> ongoing training [Esquibel] was not granted updates, changes,
> collaborations with other SRO's [sic], and he was not able to share his
> experiences and challenges in the work place. The department failed to
> maintain [Esquibel's] training cycles and failed to educate [him] on
> maintaining a safe learning environment. . . . [Enumerated training]
> courses would have ensured that [Esquibel] understood the needs of school
> district policing and would have made his misconduct less likely. SRO's
> [sic] must be trained on and knowledgeable of the power that their uniform,
> status and position can have especially on a child. Abuse of power is a
> serious concern for school resource officers. Training and repeated
> reinforcement of the essential principles supporting an SRO program
> decreases the incidence of officers' deviation from the rules.

[Doc. 96-15 p. 4-5] Having examined the Memorandum of Understanding, Sergeant Moore opined that the Belen Police Department understood these principles, yet in its failure to provide more consistent and thorough supervision and training demonstrated a deliberate indifference to the likelihood of Esquibel's misconduct. [Doc. 96-15 ¶ 7]

Viewing the totality of the evidence in the light most favorable to Plaintiff, a jury could reasonably conclude that the Belen Police Department had a "policy or custom" of inadequate training and supervision of its SRO, and that there existed a direct causal link between that policy or custom and the alleged injury. *Bryson*, 627 F.3d at 788. The City's *Motion for Summary Judgment* as to Count V shall be denied.

**The City's Motion for Summary Judgment as to Count VII**

In Count VII, Plaintiff claims, pursuant to 42 U.S.C. Section 1983, that the City violated her Fourteenth Amendment substantive due process rights by endorsing and

ratifying Esquibel's misconduct.  [Doc. 14 ¶¶ 119-132]  This claim rests primarily on the theory that, despite the Belen Police Department's knowledge of M.S.'s allegations, Chief of Police Dan Robb "publicly celebrated Esquibel as a 'model officer' after his death" by praising him at his memorial service.  [Doc. 96 ¶ OO; Doc. 96-10 p. 4-5; Doc. 97 p. 24]  The undisputed material facts do not support Plaintiff's ratification claim.

"[A] municipality will not be found liable under a ratification theory unless a final decisionmaker ratifies an employee's specific unconstitutional actions, as well as the basis for these actions."  *Bryson*, 627 F.3d at 790.  This standard is not satisfied where the municipality gives a "general commendation" of an employee's work.  *Id.*  Chief Robb's laudation of Esquibel at a memorial service for the then-recently deceased officer cannot reasonably be viewed as a ratification of Esquibel's sexual abuse of M.S.  *See id.* (holding that police supervisor's commendation of an employee's "dedication and professionalism in contributing to the judicial process" did not meet the ratification standard (alterations omitted)).  Nor is there any proffered evidence that, after learning of Esquibel's alleged sexual abuse of M.S., the Belen Police Department took any action to indicate any tacit or explicit ratification of the abuse.  *See id.* (holding that a ratification claim failed where, upon learning of the employee's wrongdoing, the city neither concealed nor ratified it; rather it investigated the matter and eventually terminated the employee).  The City's *Motion for Summary Judgment* as to Count VII shall be granted.

**CONCLUSION**

For the reasons stated herein, *City of Belen's Amended Motion for Summary Judgment as to Counts III, IV, V, and VII on Qualified Immunity and Other Grounds*, filed September 22, 2016 [Doc. 87] is **GRANTED in part** and **DENIED in part**. The *Motion* is **DENIED** as to COUNT III, IV, and V; and the *Motion* is **GRANTED** as to COUNT VII.

**IT IS SO ORDERED** this 18th day of July, 2017 in Albuquerque, New Mexico.

**M. CHRISTINA ARMIJO**
**Chief United States District Judge**