IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

M.S.

 Plaintiff,

v.                 No. 15-cv-912-MCA-SCY

BELEN CONSOLIDATED SCHOOL
DISTRICT, CITY OF BELEN, and
ESTATE OF MICHAEL ESQUIBEL,
in his personal capacity acting under color of law,

 Defendants.


## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on *Defendant City of Belen's Motion for Partial Summary Judgment That the Torts Alleged by Plaintiff Do Not Fall within the Scope of Officer Esquibel's Duties*, filed September 6, 2016. [Doc. 83] The Court has considered the parties' submissions, the relevant law, and the record and is otherwise fully advised. The *Motion* is not well taken, and shall be denied.

**BACKGROUND**

  This lawsuit arises out of allegations that Michael Esquibel (now deceased), an officer of the Belen Police Department who worked as a school resource officer (SRO), sexually abused M.S., a minor student who attended Belen Middle School and Belen High School. [Doc. 14 ¶¶ 23-34] Count II of the *Complaint* is the subject of the City's *Motion*. [Doc. 83 p. 1] In Count II, M.S. states a claim under the New Mexico Tort Claims Act for personal injuries resulting from assault, battery, and deprivation of rights

1

caused by the alleged sexual abuse. [Doc. 14 ¶¶ 84-91] Among matters pertaining to this claim, M.S. alleges that: "Esquibel acted with the authority granted to him by the Belen Police Department/City of Belen and by virtue of his position as a school resource officer"; "Esquibel would not have been in a position to harm M.S. and inflict injury upon her but for his position as a school resource officer and the authority conferred upon him by the City of Belen"; and "Esquibel was acting in the scope of his duties with the City of Belen and for the City of Belen's benefit." [Doc. 14 ¶¶ 88-90]

Under the New Mexico Tort Claims Act, governmental entities are not immune from liability for the torts of assault and battery committed "by law enforcement officers *while acting within the scope of their duties*." NMSA 1978, § 41-4-12 (1978) (emphasis added). Nor are they immune from liability for the deprivation of any rights secured by the constitution and laws of the United States or New Mexico. *Id.* Further, the state and its governmental entities are required to defend and to pay judgments against public employees who, while "acting within the scope of duty[,]" commit assault or battery or deprive a person of her rights. NMSA 1978, § 41-4-4(B), (D) (2015).

The City seeks summary judgment on the ground that Officer Esquibel was not acting within the scope of his duties when he allegedly sexually abused M.S. [Doc. 83 p. 1] Therefore, the City contends, it has no duty to defend or indemnify Esquibel's estate against M.S's claims.[1] [Id.]

---

[1] The parties' reference to "vicarious liability" in the context of the Tort Claims Act is a misnomer. [See Doc. 14 p. 11-12; Doc. 83 p. 1] The "purposes of the definition [of scope of duties] in the Tort Claims Act are to make [the] government responsible for the torts of its employees for which immunity is waived to a similar extent as a private

**Standard for Summary Judgment**

Rule 56 of the Federal Rules of Civil Procedure allows summary judgment when the evidence submitted by the parties establishes that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant meets this burden, the nonmovant is required to put in the record facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); Fed. R. Civ. P. 56(c). An issue is "genuine" when the evidence before the Court is such that a reasonable jury could return a verdict in favor of the nonmovant as to that issue. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248-52 (1986). A fact is "material" if under the substantive law it is essential to the proper disposition of the claim. *Id.* at 248.

It is not the Court's role to weigh the evidence, assess the credibility of witnesses, or make factual findings in ruling on a motion for summary judgment. *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 627 (10th Cir. 2012). Rather, the Court assumes the admissible evidence of the nonmovant to be true, resolves all doubts against the movant, construes all admissible evidence in the light most favorable to the nonmovant, and draws all reasonable inferences in favor of the nonmovant. *Hunt v. Cromartie*, 526 U.S. 541,

---

employer would be under the doctrine of respondeat superior and to indemnify the employee for acts occurring in the scope of the employee's duties." *Medina v. Fuller*, 1999-NMCA-011, ¶ 12.

551-52 (1999).

**Law Relating to the Scope of Duty Analysis**

As used in the Tort Claims Act, "'scope of duty' means performing any duties that a public employee is requested, required[,] or authorized to perform by the governmental entity, regardless of the time and place of performance[.]" NMSA 1978, § 41-4-3(G) (2015). In a scope of duty analysis, the focus is on the employee's *duty* as it relates to the act at issue. *Risk Mgmt. Div. v. McBrayer*, 2000-NMCA-104, ¶¶ 19-20. The inquiry does not turn upon whether the act itself was requested, required, or authorized by the employer. *Id.* Thus, a governmental entity may be liable for an employee's unauthorized tortious or criminal conduct, provided that there is *some connection* between the conduct and the duties that the employee was requested, required, or authorized to perform on behalf of the public entity. *Id.* ¶ 20. "Whether an employee is acting within the scope of duties is a question of fact, and summary judgment is not appropriate unless only one reasonable conclusion can be drawn from the facts presented." *Celaya v. Hall*, 2004-NMSC-005, ¶ 28.

The range of application of "scope of duty" has been examined in three leading New Mexico cases, *McBrayer*, *Medina*, and *Celaya*. They are briefly reviewed here, as they inform the Court's analysis.

In M*cBrayer*, the New Mexico Supreme Court held that a university instructor who used the distribution of homework assignments as a ruse to lure a student to his apartment where he sexually assaulted, tortured, and tried to kill her could be found to have been acting "within the scope of his duties." 2000-NMCA-104, ¶¶ 3-4, 20 (holding

4

that the scope of duty issue was ultimately one for the fact-finder).  While the tortious acts of the professor were obviously not requested, required, or authorized by the university, the court focused not on those *acts*, but, rather, on the professor's *duty* of distributing homework.  *Id.* ¶¶ 19-20 (stating that "the issue of scope of duty centers on what [the university] requested, required or authorized as it related either generally or specifically to [the professor's] duty as an instructor to help a student obtain her homework assignments").  Because the professor used his duty of distributing homework as a subterfuge to accomplish the assault, the court reasoned, a fact-finder could determine that his criminal actions fell within the scope of his duty.  *Id.* ¶ 20.

In *Medina*, the New Mexico Court of Appeals held that a sheriff's deputy (the defendant) was within the scope of her duties while she was driving a sheriff's department car home from work and was in a car crash.  1999-NMCA-011 ¶ 9, 12.  The defendant had left work, stopped to see her husband at his place of employment, and then continued toward home.  *Id.* ¶ 2.  She realized that she had forgotten something at her husband's workplace and returned to retrieve it.  *Id.*  On her way home from her second visit to her husband's workplace, she was in the car crash that led to a tort claim.  *Id.*  The evidence demonstrated that the defendant "was authorized or permitted, if not required, to use the [sheriff's department car] to go to and from work in order to facilitate her investigative duties."  *Id.* ¶ 11.  Under these circumstances, the *Medina* court held that the defendant's "actions in driving the take-home vehicle home from work [fell] within the literal definition of 'scope of duties'" under the Tort Claims Act.  *Id.* ¶ 12.  The court also observed that the question whether the defendant was on duty or off duty (her statements

in that regard had been inconsistent) was not dispositive of the scope-of-duty question. *Id.* ¶ 25.

In *Celaya*, a sheriff's department volunteer chaplain drove his department-issued vehicle to a store on a personal errand. 2004-NMSC-005 ¶¶ 3, 4. In the parking lot, he drove over the foot of a store employee. *Id.* ¶ 2. Relying on *Medina* and *McBrayer*, the *Celaya* court sought to determine whether "there was a connection between the public employee's actions at the time of the incident and the duties [that he] was 'requested, required or authorized' to perform." *Celaya*, 2004-NMSC-005, ¶ 26. The chaplain did not recall where he was coming from at the time he ran over the store employee's foot, but he stated in an affidavit that he only drove the department vehicle when performing chaplain duties for the department. *Id.* ¶ 27. Reasoning that "a minor deviation in the form of an incidental personal errand, does not take [a public employee] outside the scope of his official duties[,]" the Court held that a fact-finder, believing the chaplain's statement that he never drove the department vehicle exclusively for personal use, could find that the chaplain stopped at the store after coming from a "chaplain assignment" and had therefore been acting within the scope of duty at the time of the tortious conduct. *Id.* ¶¶ 26-27.

 **Analysis**

The City seeks to satisfy its initial burden of demonstrating the absence of a genuine issue of material fact, *Celotex*, 477 U.S. at 323, based on the following three undisputed facts:

1. Plaintiff claims that Officer Esquibel had sexual contact with her at his apartment on two successive days, off-campus, after school, in the spring of 2011, when Plaintiff was 14 years old and he was a School Resource Officer.

2. Plaintiff claims that the first time she went to Esquibel's apartment, she went in response to an invitation Esquibel had made to lend Plaintiff baseball equipment he had at his apartment so she could play with her father or try out for a community baseball league.[2]

3. Plaintiff claims that the second time she went to Esquibel's apartment, she did so because he said he needed to talk to her about something, but he didn't say what it was.

[Doc. 83 ¶¶ 1-3; Doc. 83-1] Applying the four-factor "scope of employment" test to these facts, the City argues, demonstrates that Esquibel's sexual abuse of M.S. (assumed for the purpose of this *Motion* to have occurred) fell outside the scope of his employment, and by extension, was not within his "scope of duty." [Doc. 83 p. 2-4]

The City's reliance on *Pena v. Greffet*, 922 F.Supp.2d 1187 (D.N.M. 2013) (arising out of a § 1983 claim for vicarious liability against the private operator of a state prison and its employees), for the factors and application of the "scope of employment" test is unavailing in the context of this case. "Scope of duties" as defined in the New Mexico Tort Claims Act is a "unique standard to be applied to [New Mexico Tort Claims Act] claims based upon the acts of public employees." *Celaya*, 2004-NMSC-005, ¶ 22. "The legislative choice of this phrase sets the standard apart from the common-law

---

[2] Although these facts are undisputed, M.S. asserts, and the record shows, that the second fact is "incomplete." [Doc. 9 p. 13] According to M.S.'s deposition testimony, upon which the City relies for its facts, Esquibel told M.S. that she was "good enough [at baseball] to join the Belen Police Department softball team" and that she should go to his apartment to borrow some baseball equipment so that she could practice with her dad. [Doc. 83-1 p. 5-6]

7

concept of 'scope of employment.'" *Id.* One aspect of this distinction is that "scope of employment" is limited to "officially authorized or requested acts," whereas the "scope of duty" encompasses unauthorized acts, including tortious and criminal conduct, provided that there is a connection between such acts and the employee's authorized duties. *Id.* ¶¶ 24-25. Here, the Court will focus its analysis on whether Esquibel's actions satisfied the unique "scope of duties" standard under New Mexico state law.

Furthermore, the City's narrow factual presentation, ostensibly designed to fit its "scope of employment" analysis, does not provide the Court with a basis for granting summary judgment in this case. This is particularly so in light of M.S.'s "counterstatement of undisputed material facts" which, viewed in the context of the New Mexico Tort Claims Act, renders this case unsuitable for summary judgment. [Doc. 96 p. 2-13] Those facts, which are undisputed by the City, include the following.

Esquibel worked for the City of Belen as police officer assigned to serve as Belen Middle School's and Belen High School's SRO at the same time that M.S. attended both schools. [Doc. 83-1 p. 3; Doc. 96 ¶ F; Doc. 14 ¶¶ 18-19; Doc. 17 ¶¶ 18-19] Esquibel's SRO duties required him to be present on campus during the school day, and to attend athletic events after school hours. [Doc. 96 ¶ G; Doc. 96-3 p. 3] Further, Esquibel was praised by his superiors for his outreach and involvement with students beyond typical "policing" activities. Specifically, in a performance evaluation, Esquibel was rated as "outstanding" for being "proactive" with the students and building a good rapport with them. [Doc. 96 ¶ H; Doc. 96-5 p. 2] He received another "outstanding" rating on the evaluation for getting "some of the kids of the community together to play ball" including

"on his own time and on weekends" thereby promoting a "healthy image fo[r] the [police] department." [Doc. 96 ¶ H; Doc. 96-5 p. 5]

M.S. first met Esquibel when she was in the seventh grade and Esquibel was the SRO for Belen Middle School. [Doc. 96 ¶ I; Doc. 96-6 ¶ 2] Esquibel discovered that M.S. enjoyed baseball. [Doc. 96 ¶ K; 96-7 p.7] Thereafter, when M.S. was still in middle school, Esquibel would play softball with her on campus during school hours, and off campus. [Doc. 96 ¶ K; Doc. 96-6 ¶ 5] Esquibel always wore his police uniform when he played softball with M.S, and he kept M.S.'s softball glove, balls, and a bat in the trunk of his police car. [Doc. 96 ¶ K; Doc. 96-6 ¶¶ 5-6]

On one occasion, Esquibel asked M.S. to walk to a certain off-campus location from which he picked her up in his police car and drove her to a field where they played softball with other police officers, all of whom were wearing their police uniforms. [Doc. 96 ¶ M; Doc. 96-7 p. 13; Doc. 96-9 p. 1-2] Among the uniformed officers present at the field that day were Esquibel's direct supervisor, Lieutenant Robert Miller. [Doc. 96 ¶ M; Doc. 96-4 p. 2; 96-8 ¶ 10] The officers told M.S's older sister, who had gone to the field to check on M.S. after learning that she had gotten into Esquibel's police car, that they were wearing their uniforms because they were on duty. [Doc. 96 ¶ M; Doc. 96-8 ¶ 12] Esquibel was only permitted to drive his police vehicle while he was on duty or driving to or from work. [Doc. 96 ¶¶ EE; 96-10 p. 3]

One day, when M.S. was in the eighth grade, Esquibel was playing catch with her on campus during the school lunch hour, and he told her that she was good enough to join the Belen Police Department softball team. [Doc. 96 ¶ N; Doc. 96-7 p. 6-7, 16] Esquibel

told her that he had softball equipment that she could borrow so that she could practice the game with her father, and get selected to join the Belen Police Department softball team. [Doc. 96 ¶ N; Doc. 96-7 p. 3, 7, 12-13] He said that the equipment was at his apartment, and he invited M.S. to walk to his apartment on her way to band practice to pick it up. [Doc. 96-7 p. 6-7] M.S. accepted the invitation, and walked to Esquibel's apartment as he had instructed. [Doc. 96 ¶ N; Doc. 96-7 p. 6-7] When she arrived, Esquibel told her that the softball equipment was in the back room, but when she went inside she realized that Esquibel had directed her to his bedroom, and that there was no softball equipment. [Doc. 96 ¶ P; Doc. 96-7 p. 6-8] Esquibel followed her into the room and closed the door behind him. [Doc. 96 ¶ P; Doc. 96-7 p. 7] He grabbed her by the hips, walked her to the bed, and threw her and himself onto the bed. [Doc. 96 ¶ P; Doc. 96-7 p. 9] M.S. was "freaked out" and "shocked" because she had only gone to Esquibel's house for softball equipment, and Esquibel, who was dressed in his full police uniform, was still wearing his utility belt. [Doc. 96 ¶ P; Doc. 96-7 p. 9] Esquibel put his hand down M.S.'s pants, put his penis in her mouth, and ejaculated on her face. [Doc. 96 ¶ P; Doc. 96-7 ¶ p. 10-11] Esquibel wiped M.S.'s face with a napkin, and told her not to tell anyone what had occurred. [Doc. 96 ¶ Q; Doc. 96-7 p. 11] After the incident, Esquibel told M.S. that he had to go because he was still working and was only on a break or a lunch break.[3] [Doc. 96-7 p. 12] M.S. left Esquibel's apartment and went to marching band practice. [Doc. 96-7 p. 12]

---

[3] The City contends that M.S.'s deposition testimony that Esquibel told her that he was on "a break" or a "lunch break" at this time is inadmissible hearsay. [Doc. 107 p. 7] The Court

The next day, Esquibel asked M.S. to go to his apartment again because he needed to talk to her. [Doc. 96-7 p. 18-19] M.S. explained that she went back because Esquibel "was a police officer at the time. I would have [seen] him at the school anyway. It would have been awkward for me to have seen him." [Doc. 96 ¶ S; Doc. 96-7 p. 18] M.S., who believed that, as a police officer, Esquibel had authority "over everybody," had seen him arrest kids at school, stated that she "felt like he would have done something" if she had declined this second invitation. [Doc. 96 ¶¶ S, AA; Doc. 96-7 p. 18, 22] M.S. agreed to go to Esquibel's apartment, but told Esquibel that she could go "[o]nly for a couple of minutes, I need to get to band." [Doc. 96 ¶ T; Doc. 96-7 p. 19] When M.S. arrived at his apartment, Esquibel was wearing his police uniform, including his utility belt. Esquibel apologized for "what he did the previous day[,]" and then went into his bedroom and asked M.S. to "[c]ome here real quick." [Doc. 96-7 p. 19] When M.S. entered the bedroom, Esquibel grabbed her hand, pushed her down, and told her to close her eyes. [Doc. 96 ¶ T; Doc. 96-7 p. 19] Esquibel removed his pants and underwear and put his penis in M.S.'s mouth. [Doc. 96-7 p. 19] M.S. pulled away or pushed Esquibel off of her, and left the apartment. [Doc. 96-7 p. 19]

After this second incident, M.S. sent a text message to a friend and classmate at Belen Middle School saying "I need to talk to you about Mike" (referring to Esquibel).

---

disagrees. Esquibel's statements are admissible nonhearsay under Fed. R. Evid. 801(d)(2)(D), which provides that a statement that "is offered against an opposing party and was made by the party's . . . employee on a matter within the scope of that relationship and while it existed" is not hearsay. *See* 5 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence, § 801.33[2][c] (Joseph M. McLaughlin, et al., eds., 2nd ed. 2013)("[T]o qualify as nonhearsay under Rule 801(d)(2)(D), the statement need only be related to the declarant's duties.").

[Doc. 96 ¶ U; Doc. 96-7 p. 5] The next day, before she talked to her friend, her phone was confiscated by a school employee. [Doc. 96 ¶ U; Doc. 96-7 p. 5] As the SRO, Esquibel was able to obtain the confiscated phone, and when he read M.S.'s text message to her friend, he used his authority as the SRO to remove M.S. from English class, whereupon he confronted her, saying "You were going to tell on me"; and "Do you want to get in F'ing trouble?" [Doc. 96 ¶¶ U-V; Doc. 96-7 p. 21] Esquibel forced M.S. to stay with him for the rest of the day, preventing her from attending a pep rally and the remainder of her classes. [Doc. 96 ¶ V; Doc. 96-7 p. 21]

M.S. never spoke to her friend about Esquibel. [Doc. 96 ¶ W; Doc. 96-7 p. 5] She kept the abuse a secret until she was a senior at Belen High School. [Doc. 96 ¶ X; Doc. 96-7 p.16] After M.S. disclosed the abuse and the New Mexico State Police began a criminal investigation into the matter, Esquibel committed suicide. [Doc. 96 ¶¶ X, OO; Doc. 96-7 p. 16; Doc. 96-10 p. 4-5] Until his death, Esquibel continued in his role as the SRO and, although M.S. tried to avoid him, she saw him at school (he removed her from class a couple of times in high school) and she received a number of sexualized text messages from him. [Doc. 96 ¶¶ X-Y; Doc. 96-7 p. 14-15, 23-25]

The foregoing facts, when viewed in the light most favorable to M.S., could lead a reasonable jury to find that Esquibel was acting within the scope of duties when he sexually abused M.S. at his apartment. *See Celaya*, 2004-NMSC-005, ¶ 28 ("Whether an employee is acting within the scope of duties is a question of fact[.]"). From the fact that the Belen Police Department sanctioned Esquibel's practice of playing ball with students, even on his own time and on weekends, and from the fact that Esquibel drove

M.S. in his police car to a field to play ball with fellow on-duty officers, including his supervisor, a reasonable jury could conclude that as a SRO, he was authorized to play ball with students on or off campus, and to transport students in his police car to facilitate that activity. *See* § 41-4-3(G) (defining "scope of duty" as the performance of "any duties that a public employee is requested, required[,] or authorized to perform by the governmental entity, regardless of the time and place of performance"). Additionally, that Esquibel played ball with M.S. several times during the school day, that he kept her equipment in the trunk of his police car, which he was only authorized to use when he was on duty, and that he suggested that M.S. could join the Belen Police Department softball team are facts from which a jury could reasonably infer some connection between Esquibel's authorized duties and his invitation to M.S. to borrow baseball equipment from his apartment. That Esquibel's invitation was a ruse to lure M.S. to his apartment so that he could pursue his own criminal and tortious interests is comparable to the "homework" ruse used by the professor in *McBrayer*.

Furthermore, as exemplified by *Medina*, *Celaya*, and *McBrayer*, the "scope of duties" analysis turns on the question whether there is any connection "generally or specifically" between the public employee's wrongful conduct and his requested, required, or authorized duties. *See McBrayer*, 2000-NMCA-104 ("[T]he scope of duty [issue] centers on what [the employer] requested, required or authorized as it related either generally or specifically to [the defendant's] duty as an instructor[.]"). In addition to the specific connection between Esquibel's duties and the first incident of sexual abuse described above, a jury could reasonably find a general connection between Esquibel's

13

position as SRO and his entire relationship with M.S., including the second incident of abuse and his role in persuading M.S. to stay quiet about the abuse. For example, Esquibel's only contact with M.S. arose from his duties as SRO—a position that he used to establish a personal relationship with her during school hours. The arrangements that Esquibel made for M.S. to go to his apartment occurred on campus, during the school day while he was on duty and pursuant to Esquibel's knowledge of M.S.'s band practice schedule. That Esquibel leveraged his authority over M.S., who feared what Esquibel might do if she did not accept his second invitation, to bring her to his apartment a second time and then to prevent her from disclosing the sexual abuse, are also all facts which, if believed by a jury, could lead to a finding that Esquibel acted within the scope of his duty when he sexually abused M.S.

In sum, M.S. has presented facts showing that there is a genuine issue for trial on the matter of whether Esquibel acted within the scope of his duty. See *Anderson*, 477 U.S. at 250 (stating the nonmovant's burden in the context of a summary judgment motion).

**CONCLUSION**

For the reasons stated herein, *Defendant City of Belen's Motion for Partial Summary Judgment That the Torts Alleged by Plaintiff Do Not Fall within the Scope of Officer Esquibel's Duties* (Doc. 83), filed September 6, 2016 is **DENIED**.

**IT IS SO ORDERED** this 14th day of August, 2017 in Albuquerque, New Mexico.

_____
**M. CHRISTINA ARMIJO**
**Chief United States District Judge**